## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CRIMINAL NO.:** |
| | : | |
| **v.** | : | |
| | : | **VIOLATION:** |
| **CHIQUITA BRANDS** | : | |
| **INTERNATIONAL, INC.,** | : | **Engaging in Transactions with a** |
| | : | **Specially-Designated Global Terrorist** |
| **Defendant.** | : | **(50 U.S.C. § 1705(b);** |
| | : | **and 31 C.F.R. § 594.204)** |

### INFORMATION

The United States Attorney charges that:

### COUNT ONE
### (Engaging in Transactions with a
### Specially-Designated Global Terrorist)

At all times material to this Information:

### A. General Allegations

### Defendant Chiquita Brands International, Inc.

1.       Defendant **CHIQUITA BRANDS INTERNATIONAL, INC.** ("**CHIQUITA**"), was

a multinational corporation, incorporated in New Jersey and headquartered in Cincinnati, Ohio.

Defendant **CHIQUITA** engaged in the business of producing, marketing, and distributing bananas

and other fresh produce.  Defendant **CHIQUITA** was one of the largest banana producers in the

world and a major supplier of bananas throughout Europe and North America, including within the

District of Columbia. Defendant **CHIQUITA** reported over $2.6 billion in revenue for calendar year

2003.  Defendant **CHIQUITA** had operations throughout the world, including in the Republic of

Colombia.

2.       C.I. Bananos de Exportación, S.A. (also known as and referred to hereinafter as

"Banadex"), was defendant **CHIQUITA'S** wholly-owned Colombian subsidiary. Banadex produced

bananas in the Urabá and Santa Marta regions of Colombia. By 2003, Banadex was defendant **CHIQUITA'S** most profitable banana-producing operation. In June 2004, defendant **CHIQUITA** sold Banadex.

### The AUC

3.     The United Self-Defense Forces of Colombia – an English translation of the Spanish name of the group, "Autodefensas Unidas de Colombia" (commonly known as and referred to hereinafter as the "AUC"), was a violent, right-wing organization in the Republic of Colombia. The AUC was formed in or about April 1997 to organize loosely-affiliated illegal paramilitary groups that had emerged in Colombia to retaliate against left-wing guerillas fighting the Colombian government. The AUC's activities varied from assassinating suspected guerilla supporters to engaging guerrilla combat units. The AUC also engaged in other illegal activities, including the kidnapping and murder of civilians.

4.     Pursuant to Title 8, United States Code, Section 1189, the Secretary of State of the United States had the authority to designate a foreign organization as a Foreign Terrorist Organization ("FTO") if the organization engaged in terrorist activity threatening the national security of the United States.

5.     The Secretary of State of the United States designated the AUC as an FTO, initially on September 10, 2001, and again on September 10, 2003. As a result of the FTO designation, since September 10, 2001, it has been a crime for any United States person, among other things, knowingly to provide material support and resources, including currency and monetary instruments, to the AUC.

6.     The International Emergency Economic Powers Act, 50 U.S.C. § 1701, *et seq.*,

conferred upon the President of the United States the authority to deal with threats to the national security, foreign policy and economy of the United States. On September 23, 2001, pursuant to this authority, President George W. Bush issued Executive Order 13224. This Executive Order prohibited, among other things, any United States person from engaging in transactions with any foreign organization or individual determined by the Secretary of State of the United States, in consultation with the Secretary of the Treasury of the United States and the Attorney General of the United States, to have committed, or posed a significant risk of committing, acts of terrorism that threaten the security of United States nationals or the national security, foreign policy or economy of the United States (referred to hereinafter as a "Specially-Designated Global Terrorist" or "SDGT"). This prohibition included the making of any contribution of funds to or for the benefit of an SDGT, without having first obtained a license or other authorization from the United States government.

7.     The Secretary of the Treasury promulgated the Global Terrorism Sanctions Regulations, 31 C.F.R. § 594.201, *et seq.*, implementing the sanctions imposed by Executive Order 13224. The United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"), located in the District of Columbia, was the entity empowered to authorize transactions with an SDGT. Such authorization, if granted, would have been in the form of a license.

8.     Pursuant to Executive Order 13224, the Secretary of State of the United States, in consultation with the Secretary of the Treasury of the United States and the Attorney General of the United States, designated the AUC as a Specially-Designated Global Terrorist on October 31, 2001. As a result of the SDGT designation, since October 31, 2001, it has been a crime for any United States person, among other things, willfully to engage in transactions with the AUC, without having

-3-

first obtained a license or other authorization from OFAC.

## Relevant Persons

9.     Individual A was a high-ranking officer of defendant **CHIQUITA**.

10.    Individual B was a member of the Board of Directors of defendant **CHIQUITA** ("Board").

11.    Individual C was a high-ranking officer of defendant **CHIQUITA**.

12.    Individual D was a high-ranking officer of defendant **CHIQUITA**.

13.    Individual E was a high-ranking officer of defendant **CHIQUITA**.

14.    Individual F was a high-ranking officer of Banadex.

15.    Individual G was an employee of Banadex.

16.    Individual H was an employee of defendant **CHIQUITA**.

17.    Individual I was an employee of defendant **CHIQUITA**.

18.    Individual J was a high-ranking officer of defendant **CHIQUITA**.

## Defendant Chiquita's Payments to the AUC

19.    For over six years – from in or about 1997 through on or about February 4, 2004 – defendant **CHIQUITA**, through Banadex, paid money to the AUC in the two regions of Colombia where it had banana-producing operations: Urabá and Santa Marta. Defendant **CHIQUITA** paid the AUC, directly or indirectly, nearly every month. From in or about 1997 through on or about February 4, 2004, defendant **CHIQUITA** made over 100 payments to the AUC totaling over $1.7 million.

20.    Defendant **CHIQUITA** had previously paid money to other terrorist organizations operating in Colombia, namely to the following violent, left-wing terrorist organizations:

-4-

Revolutionary Armed Forces of Colombia – an English translation of the Spanish name of the group "Fuerzas Armadas Revolucionarias de Colombia" (commonly known as and referred to hereinafter as "the FARC"); and the National Liberation Army – an English translation of the Spanish name of the group "Ejército de Liberación Nacional" (commonly known as and referred to hereinafter as "the ELN"). Defendant **CHIQUITA** made these earlier payments from in or about 1989 through in or about 1997, when the FARC and the ELN controlled areas where defendant **CHIQUITA** had its banana-producing operations. The FARC and the ELN were designated as FTOs in October 1997.

21.    Defendant **CHIQUITA** began paying the AUC in Urabá following a meeting in or about 1997 between the then-leader of the AUC, Carlos Castaño, and Banadex's then-General Manager. At the meeting Castaño informed the General Manager that the AUC was about to drive the FARC out of Urabá. Castaño also instructed the General Manager that defendant **CHIQUITA'S** subsidiary had to make payments to an intermediary known as a "convivir." Castaño sent an unspoken but clear message that failure to make the payments could result in physical harm to Banadex personnel and property. Convivirs were private security companies licensed by the Colombian government to assist the local police and military in providing security. The AUC, however, used certain convivirs as fronts to collect money from businesses for use to support its illegal activities.

22.    Defendant **CHIQUITA'S** payments to the AUC were reviewed and approved by senior executives of the corporation, to include high-ranking officers, directors, and employees. No later than in or about September 2000, defendant **CHIQUITA'S** senior executives knew that the corporation was paying the AUC and that the AUC was a violent, paramilitary organization led by Carlos Castaño. An in-house attorney for defendant **CHIQUITA** conducted an internal investigation

into the payments and provided Individual C with a memorandum detailing that investigation. The results of that internal investigation were discussed at a meeting of the then-Audit Committee of the then-Board of Directors in defendant **CHIQUITA'S** Cincinnati headquarters in or about September 2000. Individual C, among others, attended this meeting.

23.    For several years defendant **CHIQUITA** paid the AUC by check through various convivirs in both the Urabá and Santa Marta regions of Colombia. The checks were nearly always made out to the convivirs and were drawn from the Colombian bank accounts of defendant **CHIQUITA'S** subsidiary. No convivir ever provided defendant **CHIQUITA** or Banadex with any actual security services or actual security equipment in exchange for the payments, for example, security guards, security guard dogs, security patrols, security alarms, security fencing, or security training. Defendant **CHIQUITA** recorded these payments in its corporate books and records as "security payments" or payments for "security" or "security services."

24.    In or about April 2002, defendant **CHIQUITA** seated a new Board of Directors and Audit Committee following defendant **CHIQUITA'S** emergence from bankruptcy.

25.    Beginning in or about June 2002, defendant **CHIQUITA** began paying the AUC in the Santa Marta region of Colombia directly and in cash according to new procedures established by senior executives of defendant **CHIQUITA**. In or about March 2002, Individual C and others established new procedures regarding defendant **CHIQUITA'S** direct cash payments to the AUC. According to these new procedures:

(A) Individual F received a check that was made out to him personally and drawn from one of the Colombian bank accounts of defendant **CHIQUITA'S** subsidiary. Individual F then endorsed the check. Either Individual F or Individual G cashed the check, and Individual G hand-

delivered the cash directly to AUC personnel in Santa Marta.

(B) Banadex treated these direct cash payments to the AUC as payments to Individual F, recorded the withholding of the corresponding Colombian tax liability, reported the payments to Individual F as such to Colombian tax authorities, and paid Individual F's corresponding Colombian tax liability. This treatment of the payments made it appear that Individual F was being paid more money and thus increased the risk that Individual F would be a target for kidnapping or other physical harm if this became known.

(C) Individual F also maintained a private ledger of the payments, which did not reflect the ultimate and intended recipient of the payments. The private ledger only reflected the transfer of funds from Individual F to Individual G and not the direct cash payments to the AUC.

26.    On or about April 23, 2002, at a meeting of the Audit Committee of the Board of Directors in defendant **CHIQUITA'S** Cincinnati headquarters, Individual C described the procedures referenced in Paragraph 25. Individual A, Individual B, and Individual E, among others, attended this meeting.

## Designation of the AUC as a Foreign Terrorist Organization

27.    The United States government designated the AUC as an FTO on September 10, 2001, and that designation was well-publicized in the American public media. The AUC's designation was first reported in the national press (for example, in the Wall Street Journal and the New York Times) on September 11, 2001. It was later reported in the local press in Cincinnati where defendant **CHIQUITA'S** headquarters were located – for example, in the Cincinnati Post on October 6, 2001, and in the Cincinnati Enquirer on October 17, 2001. The AUC's designation was even more widely reported in the public media in Colombia, where defendant **CHIQUITA** had its

substantial banana-producing operations.

28.    Defendant **CHIQUITA** had information about the AUC's designation as an FTO specifically and global security threats generally through an Internet-based, password-protected subscription service that defendant **CHIQUITA** paid money to receive. On or about September 30, 2002, Individual H, from a computer within defendant **CHIQUITA'S** Cincinnati headquarters, accessed this service's "Colombia – Update page," which contained the following reporting on the AUC:

> "US terrorist designation
>
> International condemnation of AUC human rights abuses culminated in 2001 with the US State Department's decision to include the paramilitaries in its annual list of foreign terrorist organizations. This designation permits the US authorities to implement a range of measures against the AUC, including denying AUC members US entry visas; freezing AUC bank accounts in the US; and barring US companies from contact with the personnel accused of AUC connections."

**Defendant Chiquita Continued to Pay the AUC after the AUC was Designated as an FTO.**

29.    From on or about September 10, 2001, through on or about February 4, 2004, defendant **CHIQUITA** made 50 payments to the AUC totaling over $825,000.

30.    On or about September 12, 2001, Individual G paid the AUC in Urabá and Santa Marta by check in an amount equivalent to $31,847.[1]

31.    On or about November 14, 2001, Individual F and Individual G paid the AUC in Urabá and Santa Marta by check in an amount equivalent to $56,292.

---

[1]    With respect to all statements in this Information relating to payments by check, the "on or about" dates refer to the dates on which such checks cleared the bank, not the dates on which the checks were issued or delivered.

32.     On or about December 12, 2001, Individual F and Individual G paid the AUC in Urabá and Santa Marta by check in an amount equivalent to $26,644.

33.     On or about February 4, 2002, Individual F and Individual G paid the AUC in Urabá and Santa Marta by check in an amount equivalent to $30,079.

34.     On or about March 7, 2002, Individual F and Individual G paid the AUC in Urabá and Santa Marta by check in an amount equivalent to $25,977.

35.     On or about March 31, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in two equal payments in amounts equivalent to $3,689 each.

36.     On or about April 16, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $35,675.

37.     On or about May 15, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $10,888.

38.     On or about May 31, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in two equal payments in amounts equivalent to $3,595 each.

39.     In or about June 2002, Individual F and Individual G began making direct cash payments to the AUC in the Santa Marta region of Colombia according to the procedures referenced in Paragraph 25.

40.     On or about June 11, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in three payments in amounts equivalent to $4,764, $6,670, and $6,269, respectively.

41.     On or about June 14, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $31,131.

42.     On or about July 2, 2002, Individual F and Individual G paid the AUC in Urabá by

check in an amount equivalent to $11,585.

43.     On or about July 9, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $5,917.

44.     On or about August 6, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $4,654.

45.     On or about August 15, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $27,841.

46.     On or about September 2, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $4,616.

47.     On or about October 7, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $8,026.

48.     On or about October 15, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $40,419.

49.     On or about November 8, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $6,164.

50.     On or about November 29, 2002, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $5,685.

51.     On or about December 9, 2002, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $47,424.

52.     On or about January 21, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $7,954.

53.     On or about January 27, 2003, Individual F and Individual G paid the AUC in Urabá

-10-

by check in an amount equivalent to $22,336.

54.     On or about February 11, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $7,291.

**Defendant Chiquita Continued To Pay the AUC Against the Advice of Outside Counsel.**

55.     On or about February 20, 2003, Individual I stated to Individual C that Individual I had discovered that the AUC had been designated by the United States government as a Foreign Terrorist Organization. Shortly thereafter, Individual C and Individual I spoke with attorneys in the District of Columbia office of a national law firm ("outside counsel") about defendant **CHIQUITA'S** ongoing payments to the AUC.

56.     Beginning on or about February 21, 2003, outside counsel advised defendant **CHIQUITA**, through Individual C and Individual I, that the payments were illegal under United States law and that defendant **CHIQUITA** should immediately stop paying the AUC directly or indirectly. Among other things, outside counsel, in words and in substance, advised defendant **CHIQUITA**:

- "Must stop payments."
  (notes, dated February 21, 2003)

- "Bottom Line: CANNOT MAKE THE PAYMENT"
  "Advised NOT TO MAKE ALTERNATIVE PAYMENT through CONVIVIR"
  "General Rule: Cannot do indirectly what you cannot do directly"
  "Concluded with: CANNOT MAKE THE PAYMENT"
  (memo, dated February 26, 2003)

- "You voluntarily put yourself in this position. Duress defense can wear out through repetition. Buz [business] decision to stay in harm's way. Chiquita should leave Colombia."
  (notes, dated March 10, 2003)

- "[T]he company should not continue to make the Santa Marta payments, given the AUC's designation as a foreign terrorist organization[.]"

(memo, dated March 11, 2003)

- "[T]he company should not make the payment."
  (memo, dated March 27, 2003)

57.     On or about February 27, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $17,434.

58.     On or about March 27, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $19,437.

59.     On or about April 3, 2003, Individual B and Individual C first reported to the full Board of Directors of defendant **CHIQUITA** that defendant **CHIQUITA** was making payments to a designated Foreign Terrorist Organization.  A member of defendant **CHIQUITA'S** Board of Directors objected to the payments and recommended that defendant **CHIQUITA** consider taking immediate corrective action, to include withdrawing from Colombia.  The Board agreed to disclose promptly to the Department of Justice the fact that defendant **CHIQUITA** had been making payments to the AUC.

60.     On or before April 4, 2003, according to outside counsel's notes concerning a conversation about defendant **CHIQUITA'S** payments to the AUC, Individual C said: "His and [Individual B's] opinion is just let them sue us, come after us.  This is also [Individual A's] opinion."

61.     On or about April 8, 2003, Individual C and Individual D met at defendant **CHIQUITA'S** headquarters in Cincinnati with Individual F, Individual G, Individual H, and Individual I.  According to the contemporaneous account of this meeting, Individual C and Individual D instructed Individual F and Individual G to "continue making payments" to the AUC.

62.     On or about April 24, 2003, Individual B and Individual C, along with outside counsel, met with officials of the United States Department of Justice, stated that defendant

-12-

**CHIQUITA** had been making payments to the AUC for years, and represented that the payments had been made under threat of violence. Department of Justice officials told Individual B and Individual C that defendant **CHIQUITA'S** payments to the AUC were illegal and could not continue. Department of Justice officials acknowledged that the issue of continued payments was complicated.

63.    On or about April 30, 2003, Individual B and Individual C told members of the Audit Committee of the Board of Directors and the outside auditors of defendant **CHIQUITA** about the meeting with Department of Justice officials on April 24, 2003. Individual B and Individual C said that the conclusion of the April 24th meeting was that there would be "no liability for past conduct" and that there had been "[n]o conclusion on continuing the payments."

64.    On or about May 5, 2003, according to the contemporaneous account of this conversation, Individual I instructed Individual F and Individual J to "continue making payments" to the AUC.

65.    On or about May 12, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $6,105.

66.    On or about May 21, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $47,235.

67.    On or about June 4, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $7,623.

68.    On or about June 6, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in two payments in amounts equivalent to $6,229 and $5,764, respectively.

69.    On or about July 14, 2003, Individual F and Individual G paid the AUC in Santa

Marta in cash in an amount equivalent to $7,139.

70.     On or about July 24, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $35,136.

71.     On or about August 8, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $5,822.

72.     On or about August 25, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $12,850.

73.     On or about September 1, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $6,963.

74.     On or about September 8, 2003, outside counsel advised defendant **CHIQUITA** in writing, through Individual C and Individual I, that: "[Department of Justice] officials have been unwilling to give assurances or guarantees of non-prosecution; in fact, officials have repeatedly stated that they view the circumstances presented as a technical violation and cannot endorse current or future payments."

75.     On or about October 6, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $18,249.

76.     On or about October 6, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $9,439.

77.     On or about October 24, 2003, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $30,511.

78.     On or about November 5, 2003, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $6,937.

79.     On or about December 1, 2003, Individual F and Individual G paid the AUC in Santa
Marta in cash in an amount equivalent to $6,337.

80.     On or about December 2, 2003, Individual F and Individual G paid the AUC in Urabá
by check in an amount equivalent to $30,193.

81.     On or about December 4, 2003, Individual B and Individual C provided the Board
of Directors additional details concerning defendant **CHIQUITA'S** payments to the AUC that had
not previously been disclosed to the Board.  A member of defendant **CHIQUITA'S** Board of
Directors responded to this additional information by stating: "I reiterate my strong opinion –
stronger now – to sell our operations in Colombia."

82.     On or before December 4, 2003, defendant **CHIQUITA** created and maintained
corporate books and records that did not identify the ultimate and intended recipient of the payments
to the AUC in Urabá in calendar year 2003 as follows:

| Reporting Period | Description of recipient | Description of payment |
|---|---|---|
| 1st Quarter 2003 | "Papagayo Association, a 'Convivir.' (Convivirs are government licensed security providers.)" | "Payment for security service." |
| 2nd Quarter 2003 | "Papagayo Association, a 'Convivir.' (Convivirs are government licensed security providers.)" | "Payment for security services." |
| 3rd Quarter 2003 | "Papagayo Association, a 'Convivir.' (Convivirs are government licensed security providers.)" | "Payment for security services." |

83.     On or about December 16, 2003, Individual F and Individual G paid the AUC in
Urabá by check in an amount equivalent to $24,584.

-15-

84.    On or about December 22, 2003, Individual B sent an email to other Board members on the subject of defendant **CHIQUITA'S** ongoing payments to the AUC, stating, among other things: "This is not a management investigation.  This is an audit committee investigation.  It is an audit committee investigation because we appear to [be] committing a felony."

85.    On or about January 9, 2004, Individual F and Individual G paid the AUC in Santa Marta in cash in an amount equivalent to $10,630.

86.    On or about January 13, 2004, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $27,958.

87.    On or about February 4, 2004, Individual F and Individual G paid the AUC in Urabá by check in an amount equivalent to $4,795.

88.    From on or about October 31, 2001, and continuing until on or about February 4, 2004, within the District of Columbia and elsewhere, defendant **CHIQUITA** engaged in a continuing course of conduct willfully to engage and attempt to engage in transactions with a Specially-Designated Global Terrorist, by contributing funds to and for the benefit of the AUC, without having first obtained the required authorization from the Department of the Treasury's

Office of Foreign Assets Control, located in the District of Columbia.

**(Engaging in Transactions with a Specially-Designated Global Terrorist,** in violation of Title 50, United States Code, Section 1705(b); Title 31, Code of Federal Regulations, Section 594.204.)

JEFFREY A. TAYLOR
United States Attorney
for the District of Columbia
D.C. Bar No. 498610

By:

Jonathan M. Malis
D.C. Bar No. 454548
Denise Cheung
D.C. Bar No. 451714
Assistant United States Attorneys
(202) 305-9665
Jonathan.M.Malis@usdoj.gov

Stephen Ponticiello
PA Bar No. 44119
Department of Justice Trial Attorney
Counterterrorism Section

Dated: March 13, 2007

-17-